IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| POLYAD COMPANY, an Illinois company, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 06 C 5732 |
| v. ) | |
| ) | HONORABLE DAVID H. COAR |
| INDOPCO INC., a Delaware corporation ) | |
| doing business as NATIONAL STARCH ) | |
| AND CHEMICAL COMPANY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Polyad Company ("Polyad"), an Illinois company, brought suit in this Court under diversity jurisdiction against TSE Industries, Inc. ("TSE"), a Florida corporation, and Indopco Inc. ("National"), a Delaware corporation doing business as National Starch and Chemical Company. On January 23, 2007, Polyad filed an amended three count complaint; two counts against Indopco for tortious interference with contract and intentional interference with a business relationship and one count against TSE for breach of contract. In a separate decision dated September 25, 2007, this Court dismissed TSE. Before the Court now is National's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, National's motion is **GRANTED**.

I.  **UNDISPUTED FACTS**

Polyad is an Illinois corporation with its principal place of business in Cook County, Illinois. It sells specialty polyurethane reactive hot melt adhesives ("adhesives") to manufacturers of recreational vehicles ("RV manufacturers"). National is a Delaware

corporation with its principal place of business in Bridgewater, New Jersey. It is the dominant seller of adhesives in the United States, including sales to RV manufacturers. National does business in Illinois and sells its products in Cook County, Illinois. TSE is a Florida corporation with its principal place of business in Clearwater, Florida. It is a toll (contract) manufacturer of chemical products, including adhesives, and had a written contract (the "supply agreement") to manufacture adhesives for National. TSE manufactured and sold products to Polyad in Illinois.

Between 1990 and 2000, Gerald W. Bornhofen ("Bornhofen") was an employee of National who marketed adhesives to RV manufacturers. At National, Bornhofen was very successful, being responsible for sales of approximately $30 million per year to RV manufacturers. In March 2000, Bornhofen resigned from National. In January 2003, he became an adhesives sales employee of Polyad. Bornhofen purchased a controlling interest in Polyad in April, 2005.

In or about May 2004, Bornhofen and Anthony Rindone ("Rindone"), Vice-President of TSE, began discussions regarding TSE's proposed manufacturing of Polyad adhesives. In June 2004, TSE began to toll manufacture Polyad's adhesives pursuant to an oral agreement reached between the parties (the terms of which Polyad believes to have been reduced to writing through the transmission of emails). According to Bornhofen, Polyad would supply "forecasts" and purchasing orders to TSE and TSE would then provide pricing information and ultimately supply the requested products. On December 20, 2004, TSE informed Polyad that it was stopping production of Polyad's adhesives and would no longer accept purchase orders from them.

**National's Communications with TSE Regarding Intellectual Property**

On August 24, 2004, John Orloff, National's Vice-President of commercial development adhesives, wrote to Rindone and stated "we're doing a careful analysis of [Polyad's] products to see if they're using NSC [National] patented technology." On August 30, 2004, Orloff wrote to Rindone that he "would suggest that you ask them [Polyad] for a letter stating that they are sure that the products they [Polyad] are asking you [TSE] to make don't infringe upon anyone's IP [intellectual property]."

**National's Request to TSE to Stop Producing Adhesives for Polyad**

Glen Frommer ("Frommer"), National's Business Manager of its Bondmaster Division at all times relevant to this action, was responsible for the sales and marketing of National adhesives in the United States. Frommer supervised George Gunia ("Gunia"), a National sales manager in its Bondmaster Division. Frommer states he became concerned in 2004 that some of Polyad's products made by TSE displayed similar, if not identical packaging to National's products. He discussed these concerns with Rindone. Frommer also states he discussed raw materials shortages and National's supply leverage with Rindone in the second half of 2004. In or around the latter part of October 2004, Frommer requested Rindone to stop manufacturing adhesives for Polyad. (Frommer subsequently denied making this request but the Court will assume that he did for purposes of this motion.) Rindone testified that Frommer made the request because he was upset that Bornhofen allegedly made a claim to a mutual customer of National's and Polyad's that Polyad's adhesives had the same quality, same packaging, and were made by the same toll manufacturer. Upon Bornhofen's denial that he ever made such a claim, Rindone assured Bornhofen that he would continue to supply Polyad. Rindone also stated that he ignored Frommer's request because the only people at National with whom he negotiated and

who meant something to him were Orloff and Charlie Call, the General Manager. Rindone stated further that he did not take away TSE's business with Polyad based upon Bornhofen's alleged claims and Frommer's request; he stressed in his testimony that he took away Polyad's supply because he did not have enough raw materials to satisfy all his production needs.

**The Market for Raw Materials**

Both Polyad and National use methylene diphenyl diisocyanate ("MDI") in their adhesives. MDI comes in at least two forms, monomeric MDI, known as pure MDI, and polymeric MDI, also known as crude MDI. Both parties use monomeric MDI and polyols in their adhesives. During the fourth quarter of 2004 and the first quarter of 2005, Bayer was TSE's principal supplier of monomeric MDI. On November 17, 2004, Dow, a major chemical manufacturer of MDI, informed TSE that due to forces beyond its control, it would not be able to supply TSE with the MDI that it had previously ordered and forecasted and that it would determine an allocation amount based on the amount Dow did available to give to TSE. Two days later, Bayer declared *force majeure* (meaning forces beyond their control frustrated their ability to perform their supply obligations) regarding its ability to supply MDI and MDI-related products in North America. Approximately one month earlier, two other major suppliers of MDI, BASF and Huntsman, notified its MDI customers of price increases to MDI and polyols and strict allocation amounts of MDI. BASF's procedures would take effect in November 2004 and Huntsman's procedures would take effect in December 2004.

On December 20, 2004, Bayer cancelled two separate shipments of monomeric MDI that was to be delivered to TSE, the first shipment was to be delivered on December 21, 2004 and the second shipment in January. Rindone testified that there were three short periods in December

2004 when TSE did not possess MDI to produce adhesives. However, at no point were National's <u>shipments</u> of adhesives disturbed, although Orloff testified that there were instances in December 2004 when TSE <u>production</u> of National's adhesives were affected.

## II.     STANDARD OF DECISION

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of evidence" is insufficient) demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 252; *see also Celotex*, 477 U.S. at 324. When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003).

## III.    DISCUSSION

Under Illinois law, the elements of a tortious interference with business relationship/expectancy claim are the same for a tortious interference with economic advantage claim; they are 1) a valid business relationship/expectancy, 2) knowledge of the business relationship/expectancy by the alleged interferer, 3) purposeful interference inducing or causing

breach or termination of the relationship/expectancy, and 4) damage to the party whose relationship/ expectancy was disrupted. *Fellhauer v. Geneva*, 568 N.E.2d 870, 877, 142 Ill.2d 495, 511 (Ill. 1991). In *Dowd & Dowd, Ltd. v. Gleason*, the Illinois Supreme Court explained that "purposeful interference" means the defendant committed some impropriety while interfering. 693 N.E.2d 358, 371, 181 Ill.2d 460, 485 (Ill. 1998).

Thus, the plaintiff bears the burden of proving purposeful interference. National contends that Polyad cannot prove purposeful interference or damages, therefore making summary judgment proper. Polyad responds that it has produced evidence that demonstrates National's interference was malicious and accomplished through wrongful means. First, Polyad contends National's actions were motivated by ill will toward Polyad's owner, Gerry Bornhofen, a former National employee. Second, Polyad points out that National employees and representatives made disparaging comments about Polyad to one of Polyad's customers and also told other Polyad customers that Polyad would soon be unable to fulfill supply commitments to adhesives purchasers. Lastly, Polyad contends National representatives told TSE and a Polyad customer that Polyad's products may infringe upon National's patents.

National's statements to Polyad's customers are irrelevant to as to whether the interference was <u>improper</u> because they do not bear on National's alleged interference with the relationship *between* Polyad and TSE. It is axiomatic that there must be some nexus between the wrongful acts complained of and the harm caused. *See Film & Tape Works, Inc. v. Junetwenty Films, Inc.*, 856 N.E.2d 612, 620, 368 Ill.App.3d 462, 472 (1st Dist. 2006). Polyad has not presented any evidence that shows how National's disparaging statements made to Polyad's customers affected TSE's decision to end its relationship with Polyad.

The statements are relevant, however, to the extent that they bear on National's animus towards Polyad and thus National's motivation in interfering with the business expectancy between Polyad and TSE. However, intent is not solely determinative of impropriety. As explained in *Doremus v. Hennessy*, "[m]alice, as here used, does not merely mean an intent to harm, but means an intent to do a <u>wrongful harm</u> and injury. An intent to do a <u>wrongful harm</u> and injury is unlawful, and if a <u>wrongful act</u> is done to the detriment of the right of another it is malicious, and an act maliciously done, with the intent and purpose of injuring another, is not lawful competition." 52 N.E. 924, 176 Ill. 608, 616 (Ill. 1898) (emphasis added). Thus, the *Doremus* opinion explains that the intent of the actor is not, in and of itself, determinative of liability and is not at all indicative of the inherent wrongfulness of the act, which must necessarily be assessed by some objective measure. Moreover, the Restatement (Second) of Torts, upon which Illinois courts have relied, states in relevant part that "[o]ne who *intentionally* <u>and</u> *improperly* interferes with another's prospective contractual relation... is subject to liability...." Section 766B (1979) (cited as authority in *Dowd & Dowd, Ltd.*, 693 N.E.2d at 371, 181 Ill.2d at 485).

Polyad asserts that it can demonstrate National's actions were wrongful in and of themselves. First, it contends that National made false claims of intellectual property infringement against Polyad to TSE. Second, it contends that National threatened and intimidated TSE into severing its relationship with Polyad. Physical molestation, threats and intimidation, fraud, and misrepresentations are acts that are inherently wrongful and will result in liability. *Doremus*, 52 N.E. at 924, 176 Ill. at 614. Incidently, those same acts will destroy a

defendant's reliance on the so-called competitor's privilege to tortious interference with a business expectancy. *Film & Tape Works, Inc.*, 856 N.E.2d at 620, 368 Ill.App.3d at 470.

Polyad claims that National's representatives and agents made false claims of intellectual property infringement to TSE. First, Polyad refers the Court to a written communication sent from Orloff to Rindone, in which Orloff wrote "we're [National] doing a careful analysis of [Polyad's] products to see if they're using NSC [National] patented technology." Second, another email sent from Orloff to Rindone contains a suggestion that TSE get a letter from Polyad stating that "they are sure that the products they are asking you to make don't infringe on anyone's IP." Polyad asserts that no one at National ever believed that Polyad was infringing on National's patented technology. It also asserts that National conducted testing which revealed that Polyad's products manufactured by TSE did not infringe upon National's patented technology.

National responds that the statements made by Orloff to Rindone do not amount to claims of infringement. National is correct. Stating that something *may* infringe upon a patent and asking for an *assurance* that a product does not infringe upon a patent does not have the same significance as stating that a product actually infringes upon a patent. Nevertheless, if National had actual knowledge that Polyad's products did not infringe upon National's patents when Orloff made his "cautionary" statements to Rindone, then that could be deceitful behavior that a factfinder could decide amounts to improper interference. But Polyad has no evidence of that. It is indisputable that National undertook testing in or around August of 2004 in an attempt to ascertain whether Polyad's products were infringing on National's patented technology. Rindone testified that he became aware of this testing on August 25, 2004. The record is devoid

of when the testing was completed. However, the results of the testing were inconclusive and led National to believe that further legal action was not substantiated. This was never communicated to Rindone. Furthermore, it is undisputed that both Frommer and Orloff expressed concerns to Rindone over TSE's ability to protect National's intellectual property under the terms of their agreement, both in general and in specific regard to Polyad. (Incidentally, National's requests were rational given that it allowed TSE access to its intellectual property to manufacture its products and that Polyad is National's competitor in the market for adhesives.) Rindone himself testified that no one from National ever told anyone at TSE that Polyad's products actually infringed on National's patents. Polyad has offered nothing to contest Rindone's testimony on this point. Furthermore, Rindone testified that TSE's decision was based solely on its inability to acquire raw materials.

Polyad also contends that Frommer's demand to Rindone that TSE stop manufacturing Polyad products is either 1) proof of intimidation or 2) at least a contradiction of National's assertion that it did not order TSE to stop supplying products, thus warranting denial of summary judgment. National responds that Frommer's demand did not constitute a wrongful act, and even if it did, it is completely within the scope of the competitor's privilege.

The competitor's privilege is an affirmative defense relied upon by defendants alleged to have unlawfully interfered with a legitimate business expectancy. *Soderlund Bros. v. Carrier Corp.*, 663 N.E.2d 1, 8, 278 Ill.App.3d 606, 615 (Ill.App.Ct. 1995). The privilege "allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will." *Soderlund Bros.*, 663 N.E.2d at 8, 278 Ill.App.3d at 615. According to the

Restatement (Second) of Torts, the privilege is available if (a) the expectancy concerns a matter involved in the competition between the litigants, (b) the defendant does not employ wrongful means, (c) the defendant's actions do not create or continue an unlawful restraint of trade,[1] and (d) the defendant's purpose is at least in part to advance his interest in competing with the other. Section 768 (1979) (cited as authority in *Soderlund Bros.*, 663 N.E.2d at 10, 278 Ill.App.3d at 620).

Frommer's demand that TSE stop producing adhesives for Polyad is precisely the sort of action that does not amount to wrongful behavior under the competitor's privilege. Comment on Clause B of Section 768 of the Restatement Second of Torts explains that a defendant "may use persuasion and he may exert limited economic pressure. Subject to Clause (c) (see Comment f) [no unlawful restraints of trade], he may refuse to deal with the third persons in the business in which he competes with the competitor if they deal with the competitor. Or he may refuse other business transactions with the third person relating to that business." (cited by *Soderlund Bros.*, 663 N.E.2d at 10, 278 Ill.App.3d at 620.). Thus, National's threat to stop doing business with TSE if it kept doing business with Polyad falls under the sort of communication protected by the competitor's privilege.

Polyad argues that National cannot shield its actions with the competitor's privilege because it can show National's action were motivated by malice and ill will. It offers various

---

[1] Polyad mentions briefly that National's actions may have been an unlawful restraint of trade. However, Polyad has not offered any evidence of unlawful restraint. Polyad cannot rely on this Court's decision to not allow amendment of the complaint to include an unlawful restraint of trade cause of action for the absence of such facts in its summary judgment materials. If Polyad wished to rely on unlawful restraint as an exception to the competitor's privilege, it should have included such facts and argument in these proceedings.

statements made by National employee's in support of its assertions. Before discussing the evidence of National's ill will and malice, though, it bears repeating that under Illinois law the competitor's privilege will exist where the defendant can show its intent was, <u>at least in part</u>, to further its business interests. *Soderlund Bros.*, 663 N.E.2d at 8, 278 Ill.App.3d at 615. Conversely, if the plaintiff can show the defendant was <u>wholly</u> motivated by spite or ill will, the privilege is unavailable. *Soderlund Bros.*, 663 N.E.2d at 8, 278 Ill.App.3d at 615.

Polyad contends that it can show evidence that belies National's legitimate business interests in interfering with Polyad's relationship with TSE. According to Polyad, National actually benefitted from Polyad's relationship with TSE. Polyad states in its rendition of material facts "National recognized that the TSE-Polyad RHM supply relationship benefitted National's business interests, writing 'Bornhofen's request for TSE to consider making 1.5MM pounds of RHM' would 'lower costs since the overall plant volume would go up, a win win.'"

However, the email transmission dated March 18, 2004, from which these quotations were extracted, actually demonstrates that National acknowledged it could not prevent TSE from doing business with Polyad, but as an alternative, would like TSE to protect its intellectual property and <u>to charge Polyad a higher price than what National was paying</u>, which would allow TSE to reap "fair margins" while allowing TSE's costs of production to lessen; costs savings which could be passed on to National. Therefore, the benefits to National did not flow from Polyad's presence in the market simply, but rather the benefits hinged upon National's ability to maintain control over the terms of the TSE/Polyad relationship, especially in regards to intellectual property and selective pricing. Rindone later stated in an email dated October 29, 2004 to Glen Frommer that TSE 1) was hesitant to stop producing adhesives for Polyad, 2) was

indeed able to pass off cost savings to National because of business from Polyad <u>and others</u>, and 3) would have to be compensated by National for any lost business in its next supply agreement. Rindone stated further in this email that TSE had turned down business with other adhesive sellers in the past on account of its relationship with National.

Polyad also offers an email transmission dated November 30, 2004 made by George Gunia in which he characterized Polyad as National's "deadliest competitor" as proof of National's ill will and malice against Polyad. However, it is difficult to view this statement as anything other than evidence that National viewed Polyad as stiff competition, competition that had the ability to harm National. Thus, instead of supporting Polyad's assertion that National was motivated solely by ill will, the statement actually supports the conclusion that National was, at least in part, motivated to advance its interest in weakening Polyad's ability to compete with it. In fact, Gunia's characterization of Polyad as National's "deadliest competitor" who was "cutting price with a good product" occurred within a broader discussion of how <u>National needed to differentiate one of its products</u> in the adhesives market from those of its competitors because the competitors (at which Polyad is immediately specifically named) were narrowing the gap between them and National in that market.

Similarly, Polyad cites to another statement in which a National employee stated he would rather see Polyad lose business than National gain it, is taken totally out of context and without regard to the accompanying discussion stating that Polyad had <u>exclusive</u> rights to drums of the adhesive, but that National would benefit from informing the end customer how to circumvent buying the product from Polyad (and National) and thereby save costs. Thus, the statement does not indicate what Polyad asserts it does- that National had harbored such ill will

and hatred towards Polyad that it preferred to lose business rather than to allow Polyad to have it. Instead, the statement reflects a business decision by National to deflect business it could not handle itself from Polyad, its competitor.

The foregoing evidence does not establish that National was motivated entirely by ill will and malice when it requested TSE to stop producing adhesives for Polyad, despite the fact that TSE was able to pass cost savings on to National. The overwhelming evidence shows that National was partially motivated by a fear of competition with Polyad. That is all National need show evidence of (in addition to the three prongs of the privilege analysis that are satisfied) in order to demonstrate that it is entitled to the competitor's privilege.

This Court concludes that while National's assertion that it did not order TSE to stop supplying products to Polyad is belied by evidence of Frommer's demand, that contradiction is of no moment because the demand was privileged. If TSE did in fact stop producing adhesives for Polyad at National's request,[2] then such request was a privileged exercise of persuasion and pressure authorized under Illinois law.

Buttressing this result is the undisputed fact that in November of 2004, TSE's principal supplier of monomeric MDI, Bayer, declared *force majeure* (meaning forces beyond their control frustrated their ability to perform their supply obligations) regarding its ability to supply MDI and MDI-related products in North America. On December 20, 2004, Bayer cancelled two separate shipments of monomeric MDI that was to be delivered to TSE, the first shipment was to

---

[2] Which is unlikely given that Frommer's request came in October of 2004, Rindone personally assured Bornhofen that TSE would continue its relationship with Polyad and TSE only ceased taking orders from Polyad on December 20, 2004, the same day it received the news that its principal supplier was cancelling its pure MDI deliveries.

be delivered on December 21, 2004 and the second shipment in January. It was on December 20, 2004, that TSE informed Polyad that it was stopping production of Polyad's adhesives and would no longer accept purchase orders from them. Rindone also testified that there were three short periods in December 2004 when <u>TSE did not possess MDI to produce adhesives</u>. Furthermore, approximately one month earlier, two other major suppliers of MDI, BASF and Huntsman, notified its MDI customers of price increases to MDI and polyols, as well as strict allocation amounts of MDI. BASF's procedures would take effect in November 2004 and Huntsman's procedures would take effect in December 2004.

Polyad contends that National's reliance on the purported shortages of MDI are a subterfuge. It offers expert testimony that concludes 1) prices for pure MDI rose only marginally during the fourth quarter of 2004; 2) pure MDI was not subject to the same market demand that increased the prices of polymeric MDI during the relevant period; 3) the amounts of pure MDI in the fourth quarter of 2004 were not significantly different than the amounts of pure MDI available previously during the year; and 4) pure MDI was available in sufficient quantities to fulfill Polyad's supply commitments in the fourth quarter of 2004. Taken as true, these facts do not rebut or diminish National's assertion that TSE stopped producing Polyad's product because of MDI shortages it experienced in the fourth quarter of 2004. Rindone unequivocally testified that TSE faced critical shortages of pure MDI in the relevant time span. National submitted letters from TSE's suppliers of MDI showing that they declared *force majeure* on their abilities to supply *all* MDI products. Polyad does not even address this evidence in its expert's report. Nor does Polyad's expert's report explain what supply alternatives TSE had and the associated costs of those alternatives.

## IV. CONCLUSION

For the foregoing reasons, Defendant Indopco's Motion for Summary Judgment is **GRANTED**. The Court passes no judgment on National's additional claims that the new business rule bars Polyad's claim for damages or that Polyad is otherwise unable to establish damages with reasonable certainty. All other pending motions are moot and hereby terminated. Civil case terminated.

Enter:

/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **September 12, 2008**